UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CESAR FRANCISCO VILLA,<br><br>    Plaintiff,<br><br>  v.<br><br>M. SULLIVAN, R.N.; et al.,<br><br>    Defendants.<br>_____ / | No. C 13-3311 SI (pr)<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |

## INTRODUCTION

Cesar Francisco Villa filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. The court screened the complaint and found that it stated a cognizable claim against the four named defendants for deliberate indifference to medical needs based on their alleged denial of pain medication. Defendants now move for summary judgment against Villa, and he opposes the motion. For the reasons discussed below, the motion will be granted and judgment entered in defendants' favor.

## BACKGROUND

The following facts are undisputed, unless otherwise noted:

The events at issue in this action occurred in November - December 2012 ("the relevant time"). Villa was a prisoner at Pelican Bay State Prison and was approximately 51 years old. *See* Docket # 14-5 at 6. The defendants were employed at Pelican Bay: Mary Sullivan was a registered nurse, Laurie Thomas was a licensed Physician's Assistant ("P.A."), Donald Venes was a licensed medical doctor, and Jodi Torrance worked as a health program specialist I processing health care appeals.

A. <u>Villa's Medical Conditions</u>

Each prisoner is assigned a primary care provider ("PCP"), who is either a licensed medical doctor, a licensed P.A., or a licensed nurse practitioner. The PCP has the principal responsibility for giving medical care to the assigned inmate. Villa's PCP at the relevant time was Dr. Ikegbu.

Villa had several chronic medical problems: hepatitis C, hypertension, asthma, and hypothyroidism. He took several medications for these conditions, including Hydrochlorothiazide (HCTZ) and Enalapril for hypertension, Levothyroxine or LT4 for hypothyroidism, ASA (aspirin), and a Xopenex inhaler for asthma.

Villa also had been diagnosed with spinal arthritis in August 2007. He described his spinal arthritis as a chronic, painful condition for which there is no cure. In an August 2007 radiology report, the radiologist's impression was of "minimal degenerative changes of the lumbar spine." Docket # 18-1 at 2.[1] Dr. Rowe prescribed a non-steroidal anti-inflammatory drug ("NSAID") (either naproxen or ibuprofen)[2] for the inflammation in 2007. *See* Docket # 1 at 3 and Docket # 18-1 at 3. Dr. Rowe's treatment plan in 2007 also was for Villa to continue back stretching exercises and to avoid certain exercises that impacted the spine. Docket # 18-1 at 3. In 2008, NP Risenhoover prescribed both Tylenol and ibuprofen for Villa as needed for pain for 90 days. Docket # 18-1 at 5. Villa apparently received NSAIDs (i.e., naproxen and/or ibuprofen) without problem for the next several years until November 2012.

Villa's back problems have worsened. A radiology report for an x-ray done on August 1, 2013 showed "[s]evere degenerative changes of the lumbar spine." Docket # 18-1 at 25. Villa also now suffers from muscle spasms in his back. On July 30, 2013, he was examined for low

---

[1] The August 2007 radiology report stated these findings: "There are five non rib-bearing lumbar vertebrae. There is a slight loss of anterior vertebral body height of T12. There is mild joint space narrowing of the lumbrosacral junction. There are minimal osteophyte formations at L2-3 and L4-5. The pedicles, transverse and spinous processes are preserved. The visualized portion of the SI joints appears normal." Docket # 18-1 at 2

[2] Throughout the record there are references to drugs by both their brand names and generic names. Naproxyn and Aleve are brand names for naproxen; Advil and Motrin are brand names for ibuprofen; Tylenol is a brand name for acetaminophen. Naproxen and ibuprofen are NSAIDs, and acetaminophen is not an NSAID.

2

1 back pain, and the doctor assessed him with "acute exacerbation of mechanical LBP," for which the doctor prescribed methocarbamol for five days in addition to the existing Tylenol prescription. Docket # 18-1 at 27-28. The doctor's notes also stated that a back x-ray would be obtained, and that he had counseled Villa against certain exercises and encouraged other stretching and strengthening exercises for the back pain. *Id.* at 18-1 at 27-28. Another doctor renewed a naproxen prescription on February 10, 2014. Docket # 18-1 at 29; Docket # 20-1 at 3. The evidence described in this paragraph post-dates the relevant time period by many months. There is no evidence that Villa was experiencing muscle spasms in the relevant time or that the muscle spasms he experienced in July 2013 were caused by the failure to renew his naprosyn prescription seven months earlier.

B.  <u>Nurse Sullivan</u>

Registered nurse Sullivan is "not authorized by [her] licensure to prescribe medications for patients. Consequently, under California law and CDCR policy, [she] must receive authorization" from a doctor, P.A. or N.P. "to administer prescription medications to prison inmate patients. Even for nonprescription medications, CDCR policy requires that [she] obtain authorization from an M.D., P.A., or N.P. before administering such medications to inmate patients." Docket # 14-3 at 2. As an R.N., she also is not authorized to discontinue or otherwise change medications without an order from a doctor, P.A. or N.P. *Id.*

The events that give rise to this action started on November 7, 2012. Before that date, nurse Sullivan had handled several requests from Villa for renewals of his naproxen prescription. Sullivan had communicated a request for a prescription renewal to Villa's PCP, Dr. Ikegbu, on June 11, 2012; Dr. Ikegbu approved the renewal for 90 days, and nurse Sullivan then communicated the prescription renewal to the pharmacy. Similarly, Sullivan had communicated a request for a prescription renewal to Dr. Ikegbu on September 7, 2012; Dr. Ikegbu approved the renewal for 60 days, and Sullivan then communicated the prescription renewal to the pharmacy.

3

On November 7, 2012, Villa requested another renewal of his naproxen prescription. Sullivan "consulted with Dr. Ikegbu, who declined to renew the prescription. Instead, Dr. Ikegbu ordered that Mr. Villa be scheduled for an appointment with a doctor or P.A. to evaluate his need for this medication and his overall medical care and treatment." Docket # 14-3 at 3. Sullivan communicated this to Villa.[3]

C.    Physician's Assistant Thomas

P.A. Thomas saw Villa only once in a face-to-face medical encounter. On November 9, 2012, she examined Villa "for a scheduled appointment for two purposes: (1) a Chronic Care Hepatitis visit, and (2) a Hypertension/Asthma/Hypothyroid visit." Docket # 14-5 at 2. During the visit, she focused on those conditions. On that day, his blood pressure showed that his hypertension was controlled with the aid of medication. The medical records for that examination include a section for his vital signs and physical exam in which it is noted, among other things, "PAIN: 8/10 back pain." *Id.* at 7, 11. The medical records also note that the patient's exercise was "5 days/wk; 45-1 hr daily; pushups, avoids Burpees d/t back pain." *Id.* at 9. Thomas ordered that Villa be scheduled for another appointment with his PCP in 180 days.

The parties disagree as to whether Villa requested a naproxen prescription renewal that day. Thomas declares that she has no recollection of discussing a request for naproxen with Villa during the visit, and she did not make a note of it. Thomas also states that Villa did not have a prescription for naproxen in effect on that date and, in any event, "that was not the purpose of [her] medical evaluations on that date, which were focused on Mr. Villa's other chronic medical conditions." *Id.* at 3. By contrast, Villa states that he "explained [his] condition, and asked if she could renew [his] medication; she refused." Docket # 1 at 3. At the summary judgment stage, the court accepts as true the version of the facts offered by non-movant Villa.

On November 29, 2012, twenty days after that chronic care appointment, a nurse relayed

---

[3]Nurse Sullivan also processed later requests for acetaminophen renewals that were approved, e.g., renewal requests on January 8, 2013, June 7, 2013, and July 29, 2013.

4

1  a request from Villa for a prescription for naproxen. Thomas reviewed Villa's medical and
2  medication history, and saw that Dr. Ikegbu had declined to renew the naproxen prescription on
3  November 7, 2012 and had scheduled him for a PCP appointment to evaluate his medication
4  needs. Docket # 14-5 at 3. Thomas declined to give Villa a prescription for naproxen because
5  naproxen is generally contraindicated for a patient like Villa with a history of hepatitis C and
6  because her review of his medical file did not show a need for naproxen to treat complaints of
7  lower back pain; "should he have a flare-up of his back pain, he could make a sick call request
8  to see an M.D. or P.A. to deal with that acute problem." *Id.*[4]

D.  Dr. Venes

Dr. Venes saw Villa only once in a face-to-face medical encounter. On December 13, 2012, Dr. Venes saw Villa to "discuss chronic low back pain and Rx," i.e., prescriptions. Docket # 14-2 at 7. Dr. Venes reviewed Villa's medical file and noted radiological studies from August 2007 that showed minimal degenerative disk disease in the lumber region, "a finding that is not out of the ordinary in people of Mr. Villa's age." Docket # 14-2 at 3.

> Mr. Villa's medical file also showed that he has a history of hypertension (high blood pressure) treated with medications, hypothyroidism, and asthma. His medications at that time were Hydrochlorothiazide (HCTZ) (for hypertension), Enalapril (also for hypertension), Levothyroxine or LT4 (for hypothyroidism), ASA (aspirin), and Xopenex inhaler (for asthma). He was previously treated with Naprosyn (Naproxen) for back pain at a dosage of 500 mg twice per day, which is a very high dose, but he was not on Naprosyn when I saw him on December 13, 2012.
>
> Naprosyn is one of a class of medications called non-steroidal anti-inflammatory drugs (NSAIDs). Administration of NSAIDs in doses adequate to reduce inflamation and pain can increase blood pressure. Additionally, by decreasing prostaglandin production in the kidneys, NSAIDs counteract the beneficial effects of anti-hypertension medications like the HCTZ and Enalapril Mr. Villa was taking to control his high blood pressure -- effectively rendering those medications useless.
>
> During my December 13 visit with Mr. Villa, I conducted a physical examination focusing primarily on his complaints of lower back pain. I advised him that self-care and

---

[4] P.A. Thomas also handled another request from Villa for naproxen on August 26, 2013. She again reviewed his medical records, saw that he did not have a current prescription for naproxen and that doctors had prescribed acetaminophen for acute flare-ups of back pain. She thus ordered that Villa be advised to continue taking acetaminophen and declined to order a prescription for naproxen. This event is not complained of by Villa.

5

> exercises are the optimal mode of care for chronic mechanical lower back pain like his (noting in a chart a medical journal article that supports this view), and I reviewed and demonstrated exercises he should do for his lower back pain. I also discussed with him alterations to his exercise regimen to avoid exacerbating his back pain.
>
> I further explained to Mr. Villa the side effects and potential drug interactions of NSAIDs like Naprosyn and their adverse effects on blood pressure, as well as their inactivation of any putative benefits of aspirin and his anti-hypertension medications, and the risks they pose of gastrointestinal bleeding, coronary problems, and liver and renal disease. I also told Mr. Villa that he could use acetaminophen (Tylenol) periodically during acute flare-ups of his lower back pain, and I wrote a prescription for that medication.

Docket # 14-2 at 3.

On several occasions thereafter, Villa requested and received renewals of his acetaminophen prescription from several different health care providers. Dr. Venes approved acetaminophen refill requests on January 11, 2013, and February 4, 2013. *Id.*

On February 6, 2013, nurse Sullivan consulted Dr. Venes about the fact that Villa was taking his anti-hypertension medication regimen at 11:00 a.m., which was later in the day than optimal. Dr. Venes noted in the file that this noncompliance might explain his elevated blood pressure readings. On February 7, 2013, nurse Sullivan consulted Dr. Venes about a new medication plan. It was determined that Villa would take one anti-hypertension medication before going to the yard in the morning, and then take another anti-hypertension medication after the yard time.

On March 8, 2013, Dr. Venes approved another request for renewal of Villa's acetaminophen prescription, after reviewing some lab results and noting that the lab tests showed Villa had normal renal and liver functions.

E.  <u>Appeals Handler Torrance</u>

Defendant Jodi Torrance worked as a health program specialist I at Pelican Bay. Her job was to respond to and analyze health care appeals from inmates, which included screening, rejecting or assigning inmate appeals to the appropriate management staff.

On November 15, 2012 – after Villa's encounters with nurse Sullivan and P.A. Thomas, but before his appointment with Dr. Venes – Villa submitted a health care inmate appeal in

6

which he noted he had arthritis of the spine since 2007 and chronic back pain, and complained that nurse Sullivan had "stopped [his] prescription" on November 7, 2012, and that the health care provider he saw on November 9 had refused to refill his prescription. Docket # 14-4 at 11. For relief, Villa requested "to have my prescription renewed." *Id.* at 9. A supervising nurse interviewed him about the appeal and the appeal was reviewed at the first level by Dr. Jacobsen. Dr. Jacobsen denied the first level appeal on December 19, 2012 and noted Dr. Venes' evaluation of the patient on December 13, 2012. *Id.* at 13.

Villa appealed to the second level and expanded on the description of his medical condition, expanded on the problem complained of, and added that Dr. Venes had failed to note in his file that his blood pressure allegedly had risen since his naproxen prescription was stopped. Torrance reviewed the second level appeal and rejected it on the ground that Villa had changed the issues in his inmate appeal beyond that raised at the first level of the inmate appeal system. Villa appealed, and the inmate appeal was rejected at the third level also. Defendant Torrance had no involvement with the inmate appeal other than to reject it at the second level.

One of the allegations in the complaint is that Dr. Venes "withheld portions of the medical report" from his supervisor and the appeals investigator. Docket # 1 at 3. The only competent *evidence* on this point is Dr. Venes' declaration in which he states: "I specifically noted in [his] Physician's Progress Notes that Mr. Villa wanted me to make a note in his medical chart that his blood pressure had risen since his Naprosyn was discontinued. (See Exh. A.) That note, like all medical records of inmates, was available both to my supervisor and the Pelican Bay appeals investigators and coordinators who dealt with Mr. Villa's 602 Appeal. I withheld no information whatsoever that was material to Mr. Villa's medical care and treatment from my supervisor or the appeals office personnel." Docket # 14-2 at 4.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court will grant summary judgment "against a party

7

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Villa's verified complaint is considered as evidence in evaluating the motion for summary judgment.

**DISCUSSION**

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051,

1057 (9th Cir. 2004). A defendant violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The Eighth Amendment claim requires that there be an objectively serious medical need. A "serious" medical need exists if the failure to treat an inmate's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* The evidence in the record showing that Villa had spinal arthritis and chronic back pain suffices to permit a jury to find the existence of objectively serious medical needs. *Cf. Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (Type I diabetes is a serious medical need).

The problem for Villa concerns the subjective prong of the Eighth Amendment test. A defendant is "deliberately indifferent" if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If the defendant should have been aware of the risk, but was not, then he has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). "[T]o prevail on a claim involving choices between alternative courses of treatment, the prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the prisoner's health.'" *Toguchi*, 391 F.3d at 1058 (citation omitted).

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id.* In the former case, a broader and more generalized approach to causation is taken. *Id.*

9

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted). A defendant thus would not have exposure for every shortcoming in the medical department at the prison, but only if he or she personally was deliberately indifferent.

Nurse Sullivan: Nurse Sullivan meets her burden on summary judgment by showing the absence of evidence that she acted with the deliberate indifference necessary for an Eighth Amendment violation. The evidence is undisputed that nurse Sullivan had no authority to write, renew or discontinue prescriptions and instead acted pursuant to a system in which the nurse passed inmate requests on to a doctor, P.A. or N.P. to make the prescription decision, and then she would cause that decision to be implemented and passed on to the inmate. The evidence is undisputed that Sullivan passed Villa's November 7, 2012 request on to Dr. Ikegbu, who decided to discontinue the naproxen pending an evaluation of Villa's condition and pain medication needs. (That evaluation was scheduled and was done by Dr. Venes on December 13, 2012.) While it may have appeared to Villa that "Sullivan interrupted [his] prescription renewal," Docket # 1 at 3, he presents no evidence to dispute that she merely relayed information about a decision made by Dr. Ikegbu.[5]

Villa argues without evidentiary support that nurses *can* give pain medications and that there is Adaprin available at the nurse's station. This does not save him from summary judgment for several reasons. First, he presents no evidence to support his argument. Second, Villa's

---

[5] This is not to suggest that plaintiff would fare any better had he named Dr. Ikegbu as a defendant. The evidence in the record indicates a medical concern about the endless renewals of an NSAID for a patient with hypertension and Hepatitis C. The evidence also indicates that Dr. Ikegbu acted with a plan in mind (i.e., have the patient's condition and pain medication needs evaluated by a doctor, P.A., or N.P.) rather than simply rubber-stamping the naproxen prescription renewal request.

10

request was for a renewal of a long-term naproxen prescription, not for a dose of Adaprin, even assuming arguendo that Adaprin was at the nurse's station. Third, Dr. Ikegbu had given directions to nurse Sullivan as to what to do, i.e., not renew the naproxen prescription and to set an appointment with a PCP for evaluation of the patient.

<u>Physician's Assistant Thomas</u>: On the evidence in the record, P.A. Thomas is entitled to summary judgment also. The evidence is undisputed that two days after Dr. Ikegbu declined to renew the naproxen prescription, P.A. Thomas saw Villa for a scheduled chronic care appointment for evaluation of his hepatitis C and treatment/assessment of his hypertension, asthma and hypothyroidism. There is no evidence that this was the pain medication consultation with a PCP that Dr. Ikegbu had told nurse Sullivan two days earlier to schedule. The medical records of P.A. Thomas' examination of the patient do note, however, that Villa had back pain rated an 8 out of 10, as well as that he exercised a lot.

The parties disagree whether Villa asked Thomas to renew his naproxen prescription at the appointment, and for present purposes the court accepts as true that Villa "explained [his] condition, and asked if she could renew [his] medication; she refused." Docket # 1 at 3. Although Thomas does not recall Villa requesting a renewal of his naproxen prescription that day, she does recall that, when he asked for it later that month, she refused to prescribe naproxen because she believed it was contraindicated for Villa in light of his history of hepatitis C. She further noted that she had reviewed the medical records that showed that Dr. Ikegbu had declined to renew the naproxen prescription on November 7, 2012 and had scheduled Villa for a PCP appointment to evaluate his medication needs. Thomas also had reviewed the medical file and concluded it did not show a need for naproxen to treat the lower back pain complaints and that Villa could submit a sick call request if he had a flare-up of back pain. (She also reached the same conclusion when she received another request for naproxen on August 26, 2013, and this time, noting that he had been prescribed acetaminophen for acute flare-ups of back pain, she ordered that he be advised to continue on that course.)

The dispute as to whether Villa asked and was refused naprosyn on November 9 is not a genuine dispute of a material fact because the evidence is undisputed that, even if Thomas was

11

asked, Thomas would have refused to renew the naproxen prescription that day, just as she did later that month.  The undisputed evidence shows that P.A. Thomas' refusal of the request for a naproxen prescription was based on her medical judgment that it was contraindicated for the patient in light of his medical condition.  The fact that the health care providers focused on different conditions for determining that long-term naproxen use was contraindicated for Villa – P.A. Thomas focused on his hepatitis C and Dr. Venes focused on his hypertension and medications therefor – does not show a triable issue because Villa offers no evidence that either view was medically unsupported.  Villa does not raise a triable issue of fact that P.A. Thomas' decision to refuse to prescribe naproxen and instead to direct the patient to seek medical care when he had an acute flare-up of back pain was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to his health.  *See Toguchi*, 391 F.3d at 1058.

        <u>Dr. Venes</u>:  The parties agree that Dr. Venes did not renew the prescription for naproxen on December 13, 2012, when he cared for Villa.  Dr. Venes meets his burden on summary judgment by showing the absence of evidence that he acted with the deliberate indifference necessary in not renewing that prescription.  The evidence is undisputed that Dr. Venes evaluated Villa's lower back pain and medical records, noting Villa's medical history that included hypertension treated with medications.  Dr. Venes presents undisputed evidence that the administration of NSAIDs (such as naproxen) in doses adequate to reduce inflammation and pain can increase blood pressure and counteract the beneficial effects of anti-hypertension medications, and therefore NSAIDs are contraindicated for a patient being treated for hypertension. The evidence is undisputed that Dr. Venes recommended exercises and wrote a prescription for acetaminophen to use during acute flare-ups of lower back pain, which he thought was preferable in light of Villa's hypertension.  The evidence also shows that the acetaminophen prescription was refilled several times, including by Dr. Venes on more than one occasion. Viewing the evidence and reasonable inferences in the light most favorable to Villa, no reasonable jury could conclude that Dr. Venes was deliberately indifferent to a serious medical need when he chose to recommend exercises and prescribe acetaminophen for flare-ups

instead of renewing the naproxen prescription that he thought was contraindicated.

Villa disagrees sharply that acetaminophen was adequate for his pain, arguing that it is not an anti-inflammatory medication that would treat his inflammatory condition. He presents evidence that other health care providers have prescribed NSAIDs for him. He fails to show a triable issue of fact on this point, however, as his evidence shows at most a difference of opinion among health care providers as to the proper way to address his arthritic back pain in light of his other medical conditions. A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Also, as defendants point out, Villa's evidence that other health care providers have prescribed NSAIDs does not show whether those providers had in mind his hypertension controlled by medication when they prescribed the NSAIDs. That other health care providers gave him NSAIDs does not lead to a reasonable inference that Dr. Venes' choice to give him acetaminophen and recommend exercise was "'medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [Villa's] health.'" *Toguchi*, 391 F.3d at 1058 (citation omitted).

Villa asserts a second claim against Dr. Venes, i.e., that Dr. Venes "withheld portions of the medical report from his supervisor, and the appeals investigator." Docket # 1 at 3. He presents no evidence as to what the withheld portions were, and even his arguments about what was withheld are plainly refuted by the record. In his opposition brief, Villa argues without evidentiary support that Dr. Venes did not fully document Villa's explanation of his back pain. Although Dr. Venes may not have used the precise words Villa wanted, Dr. Venes did note in the physician's progress report that the patient "reports a long history of back pain, dating back several years, felt mostly in the left paraspinal region, and occ. radiating toward the hips. The pain is felt as stiffness esp. on awakening in the morning, and usually bothers him all day long. He has not noted improvement during exercise, nor worsening a few hours after exercise." Docket # 14-2 at 7. In his opposition brief, Villa argues that he told Dr. Venes he should look into his x-ray. Docket # 18 at 5. The physician's progress report plainly shows that Dr. Venes did, as it specifically refers to the radiology report from August 2007. Villa also urges that he

13

1    told Dr. Venes that his blood pressure was higher since he was off naproxen.  Docket # 18 at
2    5.  Dr. Venes noted in the physician's progress report that "patient asks that I record in the chart
3    that his bps have risen since naprosyn was discontinued."  Docket # 14-2 at 8.  To the extent that
4    Villa is suggesting that, because he (Villa) thought that stopping the naproxen had caused his
5    blood pressure to rise, the doctor was duty-bound to agree, Villa is wrong.  Villa identifies no
6    legal or medical authority for his belief that the doctor must act as a scrivener to record as fact
7    the patient's hypotheses about his medical condition.  Villa fails to raise a triable issue of fact
8    that Dr. Venes withheld portions of the medical record from his supervisors or the persons
9    handling Villa's inmate appeals.

10          Appeals handler Torrance:  Torrance is entitled to summary judgment because there is
11   a complete absence of evidence that she acted with the deliberate indifference necessary for an
12   Eighth Amendment violation.  The evidence is undisputed that (a) a supervising registered nurse
13   interviewed Villa when he first filed an inmate appeal about the denial of his request to renew
14   the naproxen prescription, (b) a doctor denied the inmate appeal at the first level, (c) the second
15   level appeal expanded on the description of the medical problem, (c) Torrance reviewed and
16   rejected the appeal at the second level on the ground that Villa had changed the issues in his
17   inmate appeal, and (d) the inmate appeal was rejected at the third level for the same reason cited
18   by Torrance, i.e., the inmate's change of the issues was an improper attempt to bypass the lower
19   levels of review.  Villa presents no evidence that Torrance took part in any of the medical care
20   decisions with regard to his pain medications.  In light of the undisputed evidence that Torrance
21   is not a medical doctor and was not qualified to render a decision about the medical issues raised
22   in Villa's inmate appeal, the use of a supervising registered nurse and medical doctor to review
23   the first level did not amount to deliberate indifference.  Her decision to reject the inmate appeal
24   at the second level did not amount to deliberate indifference because it was a procedural
25   rejection with some basis in fact:  the description of Villa's problems *had* changed and grown
26   larger, providing some evidence to support her undisputed belief that Villa's second level appeal
27   was an attempt to bypass the first level.  Villa may disagree with Torrance's interpretation of the
28   regulations, but no reasonable jury could find that she had "refused plaintiff the right to appeal,"

14

as Villa had alleged his complaint. Docket # 1 at 3.

Defendants meet their burden on summary judgment to showing the absence of evidence that they acted with the deliberate indifference necessary for an Eighth Amendment violation. When the evidence is viewed in the light most favorable to Villa, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against defendants on his Eighth Amendment claims. Defendants therefore are entitled to judgment as a matter of law on the complaint.

Villa's request for the court to consider his late declaration is GRANTED. (Docket # 20.) The court has considered that declaration in evaluating the summary judgment motion.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 14.) Judgment will be entered in all defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: July 29, 2014

_____
SUSAN ILLSTON
United States District Judge